**In re John G. VANNOY and wife, Delide Coleman Vannoy, Debtors.**

**Bruce MAGERS, in his capacity as Chapter 7 Trustee, and NationsBank of North Carolina, N.A., Plaintiffs,**

v.

**Tommy THOMAS, Defendant.**

**Bankruptcy No. B–92–12604C–7W. Adv. No. 93–2039.**

United States Bankruptcy Court, M.D. North Carolina, Winston–Salem Division.

Aug. 15, 1994.

760

C. Edwin Allman, III, Winston–Salem, NC, for debtors.

Thomas W. Waldrep, Jr. and James D. Wall, Winston–Salem, NC, for NationsBank.

Bruce Magers, Chapter 7 Trustee.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Bankruptcy Judge.

This adversary proceeding was brought by the plaintiffs, who are the Chapter 7 trustee for the debtors and NationsBank of North Carolina, one of the principal creditors of the debtors. The purpose of this proceeding is to "invalidate, avoid, and cancel" a deed of trust which was executed by the debtors on November 18, 1991. The deed of trust was executed to secure a promissory note from the debtors to the defendant, Tommy Thomas. The amount of the promissory note to Mr. Thomas is $107,500.00 and, like the deed of trust, the note is dated November 18, 1991. The deed of trust purports to encumber a 25% undivided interest in a 15.98 acre tract of land upon which an apartment complex known as Woodfield Oaks is located. The plaintiffs contend that at the time the deed of trust was executed the male debtor was a general partner in a partnership known as Woodfield Oaks, that the Woodfield Oaks apartment complex was property of that partnership and that the deed of trust should be set aside because the debtors were not entitled to encumber partnership property. The defendant, on the other hand, contends that the apartment complex was not partnership property, that the male debtor was a tenant in common who personally owned a ¼th undivided interest in real property and that the deed of trust therefore created a valid lien upon his ¼th interest in the real estate. In short, plaintiffs claim that the debtor was a partner in a partnership that owned the apartments, while the defendant claims that the debtor was simply a co-owner of the real estate on which the apartments are located. The trial of this adversary proceeding was conducted on July 21, 1994. The findings of fact and conclusions of law of the court are set forth in this memorandum opinion.

## FACTS

In October of 1985 Doyle K. Walsh, Bruce Church, Vernon Foster and the debtor, J. Gary Vannoy, were shareholders of Woodfield Developers, Inc., a corporation which owned a large tract of land in North Wilkesboro, North Carolina. Vernon Foster suggested that these shareholders construct an apartment complex on a portion of this land. Based upon this suggestion and subsequent discussions among the group, the four individuals decided to proceed with the construction of an apartment project. It was their

intention to retain the ownership of the apartments after they were completed and to rent the apartment units to tenants in order to generate cash flow and profits. These individuals had various meetings in order to discuss this venture. These meetings included a meeting at the outset with their accountant, Tommy Thomas, to discuss how to structure the apartments. It was decided that the apartments would be structured as a partnership for tax reasons and that partnership tax returns would be filed with respect to the apartments. However, the parties apparently did not sign a written partnership agreement or any other type of written agreement regarding the ownership of the apartments. However, the parties did reach the understanding that they would share the profits and losses, if any, from the apartments.

In furtherance of their decision to construct the apartments, on October 23, 1985, the four individuals caused Woodfield Developers, Inc. to deed 15.98 acres of land to "Doyle K. Walsh, J. Gary Vannoy, Bruce Church and Vernon Foster." This deed did not contain any reference to a partnership.

On or about October 28, 1985, the four individuals named in the deed borrowed $2,250,000.00 from Northwestern Bank to pay for the construction of the apartments which they had agreed they would build. On that same date the four individuals executed a deed of trust on the 15.98 acre tract to secure the money borrowed from Northwestern Bank. The deed of trust was executed by the four individuals and their wives and did not refer to a partnership as being grantor.

In approximately May of 1986, there was discord involving Vernon Foster and he sold his interest in the venture to John A. Bauguess. This was done by means of a general warranty deed from Vernon W. Foster and wife, Jean W. Foster, dated May 7, 1986, to John A. Bauguess which provided that "a ¼ undivided interest in and to" the 15.98 acre tract was being conveyed to Mr. Bauguess.

The construction of the apartments proceeded to completion and when completed consisted of some 96 units which were known as Woodfield Oaks Apartments. Upon com-

pletion of the apartments, full time employees were hired to handle the renting, maintenance and bookkeeping for the apartments. Also, a bank account was established at First Citizens Bank in the name of Woodfield Oaks. The account was opened as a partnership account and in the banking resolution signed by the principals Woodfield Oaks was shown as a general partnership.

In September of 1990, Wayne G. Church acquired a ⅕th interest in the apartments, increasing the number of principals involved in the apartments from four to five. In that connection, the four principals and their respective wives executed a general warranty deed dated September 5, 1990, to Wayne G. Church which purported a convey "a ⅕th undivided interest" in the 15.98 acre apartment tract.

In March of 1991, as a result of a dispute involving Doyle K. Walsh and the other individuals involved in the apartments, J. Gary Vannoy acquired the interest of Mr. Walsh in the apartment venture. In that connection, Walsh and Vannoy entered into an agreement which, among other things, recited that Walsh was "a general partner in Woodfield Oaks, a North Carolina General Partnership" and a stockholder in Woodfield Developers, Inc. and that Vannoy was purchasing Walsh's interests. As part of the consideration to Walsh, Vannoy agreed in the agreement to deliver a promissory note for $466,078.11 which would be guaranteed by "all remaining general partners in Woodfield Oaks General Partnership...." Pursuant to this agreement, Doyle K. Walsh and wife, Nancy T. Walsh, executed and delivered a general warranty deed to J. Gary Vannoy conveying a "¼ th undivided interest" in the 15.98 acre tract on which the apartments were located.

On November 18, 1991, J. Gary Vannoy and wife, Delide C. Vannoy, executed a general warranty deed to Wayne G. Church, Bruce Church, John A Bauguess and J. Gary Vannoy which described the 15.98 acre tract. This deed was recorded on the same date as the transaction involving Vannoy and the defendant, Tommy Thomas, and the note and deed of trust from Vannoy and wife to Mr. Thomas were signed and recorded contempo-

raneously with the deed from Vannoy and wife to Wayne Church, Bruce Church, Bauguess and Vannoy.

The circumstances leading up to the transaction in which Vannoy executed the promissory note and deed of trust to the defendant go back to September of 1990, when a $300,000.00 loan was obtained from Wayne G. Church in order to pay down the outstanding bank loan on the Woodfield Oaks Apartments. In order to induce Wayne Church to make the loan the existing principals in Woodfield Oaks Apartments agreed to vest Church with a 20% interest in Woodfield Oaks Apartments. In that connection, Messrs. Bruce Church, Walsh, Bauguess and Vannoy and their respective wives executed a general warranty deed to Wayne G. Church which recited that "a ⅕th undivided interest" in the 15.98 acre tract was being conveyed to the grantee. Contemporaneously with this deed, Bruce Church, John A. Bauguess, Doyle K. Walsh, J. Gary Vannoy and Wayne G. Church, together with their respective wives, executed a promissory note for $300,000.00, plus interest at prime plus 1%, to Wayne G. Church, evidencing the loan which had been made by Wayne G. Church. These same parties also executed a deed of trust, also dated September 5, 1990, securing the $300,000.00 note. The final payment called for under the note was September 4, 1991. No payments were made on this note and the entire balance remained unpaid on November 18, 1991, the date of the note and deed of trust from the debtor, J. Gary Vannoy, to the defendant. The apartments had not produced sufficient cash flow to provide for the repayment of the $300,000.00 owed to Wayne Church, with the result that the money to pay Church had to be advanced by the principals. By this time Walsh had been bought out, leaving as principals only Bruce Church, John A. Bauguess, J. Gary Vannoy and Wayne G. Church. For reasons which were not articulated in any of the evidence, these parties treated this obligation as one which should be covered by advances only from Bruce Church, John Bauguess and Gary Vannoy, but not Wayne G. Church. Although Bruce Church and Mr. Bauguess each were able to come up with the $107,500.00 required to pay their respective shares, Gary Vannoy did not have the money to pay his share. In order to alleviate this dilemma, Vannoy worked out an arrangement with Tommy Thomas in which Mr. Thomas would lend the much needed $107,500.00 to Vannoy so that he could pay his share of the money required to repay Wayne G. Church.

Tommy Thomas was a partner in the accounting firm that had prepared partnership tax returns for Woodfield Oaks Apartments every year since 1985 and was the personal accountant for several of the principals, as well. Mr. Thomas had reviewed each of the partnership returns prepared for Woodfield Oaks Apartments during each year since 1985. Mr. Thomas was an acquaintance, if not a friend, of each of the principals involved with Woodfield Oaks Apartments in November of 1991.

The meeting at which Wayne G. Church was to be repaid his $300,000.00 was scheduled for the late afternoon of November 17, 1991, at Mr. Vannoy's law office in North Wilkesboro. This meeting was attended by Bruce Church, Wayne Church, John Bauguess, Gary Vannoy and Tommy Thomas. At this meeting it was explained by Vannoy and Thomas to all present that Vannoy did not have his share of the funds needed to repay Wayne Church, but that Thomas was willing to lend him the $107,500.00 needed in order to repay Wayne Church. Vannoy and Thomas further explained that the transaction would involve Vannoy giving Thomas a promissory note for the amount being loaned to Vannoy, with the promissory to be secured by a deed of trust from Vannoy on his 25% interest in Woodfield Oaks Apartments. This was readily approved by the other principals—to Wayne Church it meant that there would be enough money for him to be paid and to Bauguess and Bruce Church it meant that they did not have to come up with Vannoy's share. Mr. Thomas made good on the commitment to lend Vannoy the $107,500.00 and a promissory note for $107,500.00 to Mr. Thomas, together with the deed of trust securing the promissory note, were executed. This was done in the presence of Bruce Church, Wayne Church and John Bauguess. However, because it was after 5:00

p.m. before these instruments were signed, the deed of trust was not recorded until the following day.

Despite the loan to Vannoy, his financial situation did not improve. Instead, it deteriorated drastically, and on June 23, 1992, Vannoy and wife filed a petition under Chapter 7. This adversary proceeding, in turn, was instituted on March 17, 1993. The remaining facts relied upon by the court are set forth in the following sections of this opinion.

## ISSUES

I. Was a partnership formed by the principals involved in the ownership, operation and maintenance of the Woodfield Oaks apartment complex?

II. If so, were the apartments partnership property?

III. What were the legal consequences of the deed of trust executed by J. Gary Vannoy?

## DISCUSSION

I. *Was a partnership formed by the principals involved in the ownership, operation and maintenance of the Woodfield Oaks apartment complex?*

■ In asserting that no partnership existed and that the apartments were not partnership property, the defendant argues that the parties never signed a partnership agreement, that the original deed to the apartments was to the individual parties with no reference to a partnership, that all subsequent deeds and deeds of trust referred to the principals as individuals and not as partners or a partnership and that the current principals testified at the trial that they understood that the property was owned by the individuals, not by a partnership, and that they could transfer their respective interest if they wished to do so. These assertions are true but not determinative in this case. First, the law in North Carolina and most other jurisdictions is that a partnership may be formed without a written partnership agreement. Secondly, real property owned by a partnership may be held either in the partnership name or in the name of some or all the partners. *See,* G.S. 59–40; *Simmons*

*v. Quik–Stop Food Mart, Inc.,* 307 N.C. 33, 296 S.E.2d 275 (1982). Hence, in this case, the court must look further than merely whether there was a written partnership agreement or whether record title was in the name of a partnership. Finally, while the current principals did testify that they understood that the individuals and not a partnership owned the property, their testimony is far from conclusive. It conflicts with the testimony given by a former principal who testified that there was a partnership, that the owners referred to themselves as partners and that when he was involved he understood that he owned a partnership interest. Also, the testimony of the current principals is not consistent with evidence of what these same individuals said, signed and did during the course of their involvement with these apartments.

■ Faced with the absence of a written agreement defining the relationship between the parties and conflicting evidence regarding what the parties said, did and intended, the court is left to determine the status of the parties and the ownership of property in question by resolving the conflicts in the evidence and deciding what inferences should be drawn regarding the disputed issues. In making the necessary legal determinations regarding the existence of a partnership and the ownership of the property, the court must look to local law, which in this case is the law of North Carolina. *See, In re Wallen,* 43 B.R. 408 (Bankr.D.Idaho 1984); *In re Kress Road Partnership,* 134 B.R. 292 (Bankr.N.D.Ill.1991).

■ The starting point for determining whether a partnership existed among the individuals who acquired the land, constructed the apartments and thereafter owned and operated the apartments is the statutory definition of "partnership" which is contained in G.S. § 59–36. This statute provides that a "partnership is an association of two or more persons to carry on as co-owners a business for profit." In applying this statutory definition, reference must be had to certain statutory rules contained in G.S. § 59–37 which have been enacted in North Carolina for use in determining whether a partnership exists.

The first of these rules is that persons who are not partners as to each other are not partners as to third persons, in the absence of partnership by estoppel under G.S. § 59–46. The remaining statutory rules bear upon whether persons will be treated as partners as to each other. These additional rules include one which provides that joint ownership of property does not of itself establish a partnership whether or not the joint owners share the profits made by the use of the property. G.S. § 59–37(2). Thus, in this case, the inquiry must go beyond the fact that the real property was jointly owned and the joint owners agreed to share the profits made by the use of the property. Moreover, under another of these statutory rules, the sharing of gross returns by joint owners of property does not of itself establish a partnership. G.S. § 59–37(3). In light of these two rules, the fact that the apartments in this case may have been jointly owned and the joint owners may have agreed to share gross returns or profits, standing alone, does not establish that a partnership was formed. The remaining statutory rule is that the receipt of a share of the profits "of a business" is prima facia evidence that the recipient is a partner in the business. The applicability of this rule is disputed by the parties, since the plaintiffs contend that there was a "business" while the defendant maintains that there was no "business" but only co-ownership of real property. Fortunately, the North Carolina cases provide additional criteria for determining whether parties are engaged in a "business" to the extent that a partnership exists. Two of the leading North Carolina cases in this area are *Eggelston v. Eggelston,* 228 N.C. 668, 47 S.E.2d 243 (1948), and *Reddington v. Thomas,* 45 N.C.App. 236, 262 S.E.2d 841 (1980). These cases point out that it is not necessary that there be a written partnership agreement in order for a partnership to exist. In fact, under these cases, there is no requirement for an express agreement, either written or oral, in order to form a partnership. Rather, a partnership may be created by the conduct and declarations of the principals without an express agreement of any kind. According to these and other North Carolina cases, the conduct of the parties and the actions taken by them may give rise to an implied agreement to form a partnership. Moreover, the parties do not have to know that these actions will have the effect of creating a partnership nor do they even have to realize that a partnership has been created and that they have become partners. Under North Carolina law, the court should consider all of the attendant acts and declarations of the parties in order to determine whether a partnership has resulted and, if so, to ascertain the terms and conditions of that partnership.

The North Carolina rules for determining whether a partnership exists in the absence of an express partnership agreement are consistent with the general rules that are applied in most other jurisdictions. These rules are well summarized in 59 Am Jur 2d *Partnership* § 152:

> "The intent of parties to form a partnership may be implied; it need not be expressed in writing or orally, if it can be derived from the parties' actions. Thus, where intent is in dispute, it may be ascertained objectively from all the evidence and circumstances. It is not essential that the parties know that their contract, in law, creates a partnership. The legal effect of the parties' agreement, not their subjective intent, determines whether there is a partnership.
>
> Where parties agree on all matters which, in law, constitute a contract of partnership, it will be presumed that they intend that contract, notwithstanding that the parties proposed to avoid the liability otherwise attaching to partners, intend to avoid partnership, or even expressly stipulate that they are not partners. The legal effects of their relation follow whether or not the parties foresee and intend them, and it is immaterial that the parties do not realize they are partners."

With the foregoing legal principles in mind, and having weighed and considered the evidence which was offered during the trial, the court is satisfied that the principals involved with the Woodfield Oaks apartment complex formed a partnership. The evidence established that the principals originally involved, together with the principals who later became involved, were persons who associat-

ed together in order to carry on as co-owners a business for profit. From the outset their intent and purpose was to pursue a business venture with respect to which they were to acquire a tract of land, build a large number of apartments on that tract of land, own the apartments after they were completed and rent the apartments to tenants with the ultimate goal being to generate profits. This intent to realize a profit is an indicia of partnership without regard to whether the principals were successful in doing so. *See, Reddington v. Thomas, supra.* In pursuing their goal of realizing a profit, the principals went much further than simply owning a piece of property for rental purposes. Instead, the principals in this case were actively involved in the business. At the outset, they met together in order to decide whether to proceed with the proposed venture and in order to formulate how they would proceed in doing so. Early on they met with their accountant, Tommy Thomas, in order to discuss how to structure the business venture. Once the apartments were under construction, one of the partners, John A. Bauguess, was involved in overseeing the construction of the apartments. During the course of construction and thereafter during the years since the completion of the apartments, the principals have met sometimes as frequently as every week or two in order to discuss and deal with problems and decisions related to the ownership, operation and maintenance of the apartments. The active involvement of the principals in the rental of the apartments is confirmed by their individual tax returns in which they reported that they had "active participation" in the rental of the apartments.

■ Before the apartments were even completed, the principals filed a partnership tax return which identified Woodfield Oaks Apartments as a general partnership and which identified each of the principals as a general partner. Such partnership returns were filed on an annual basis thereafter and in each of the returns from 1985 through 1992, Woodfield Oaks Apartments was shown as a general partnership and the principals involved were shown as general partners. During each of these years, the principals each received a Schedule K–1 (Form 1065) from the accountants which identified Woodfield Oaks Apartments as a partnership and identified each principal as a partner. Thus, each principal, from the outset, was aware that Woodfield Oaks Apartments was being treated as a partnership and that each of the principals was being identified as a general partner. Under North Carolina law, the filing of these partnership tax returns is "significant" evidence of the existence of a partnership and may constitute an admission against interest by a party who denies the existence of a partnership after having signed a partnership return. *Davis v. Davis,* 58 N.C.App. 25, 293 S.E.2d 268 (1982).

In February of 1986, the principals opened a checking account at First Citizens Bank for Woodfield Oaks Apartments. The banking resolution which was signed by the partners stated that "Woodfield Oaks is the trade name of an unincorporated business, which business is a General Partnership...." When the apartments were completed and ready to be rented, an employer tax identification number was obtained on behalf of Woodfield Oaks Apartments as a general partnership. Woodfield Oaks maintained a business office from the outset. Beginning in approximately 1986, full time employees were employed to handle the renting of the apartments, bookkeeping and maintenance for the apartments. These employees were treated by the principals as being employed by Woodfield Oaks, rather than being employed by the individual principals. Employer's quarterly federal tax returns were filed with respect to these employees which showed the employer as Woodfield Oaks and referred to Bruce Church as being a "Gen Ptr", meaning "general partner". The employees thus were treated as being employed by a separate entity from the individuals, namely, a general partnership known as Woodfield Oaks. During the years since the apartments were completed in approximately 1986, regular and continuing expenses have been incurred in connection with the operation and maintenance of the apartments. These expenses have included charges for advertising, utilities, telephone service, accounting services, insurance premiums, pest control, general office expenses, *ad valorem*

taxes to the city and county, and legal services. These expenses have been incurred in the name of Woodfield Oaks as a separate entity and not by the principals individually. Over the years, the rents from the apartments have been deposited in bank accounts in the name of Woodfield Oaks and the expenses incurred in the name of Woodfield Oaks Apartments have been paid by checks written on those partnership accounts.

At various times since the apartments were completed, miscellaneous personal property has been acquired for use in connection with the operation and maintenance of the apartments. For example, a copy machine and mowing equipment have been acquired. Such equipment has been acquired in the name of Woodfield Oaks and not in the name of the principals individually. For example, in 1993 a pickup truck was purchased for use by the employees of Woodfield Oaks. The pickup truck was acquired and titled in the name of Woodfield Oaks. The documents which were executed in connection with purchasing the truck were signed "Woodfield Oaks by Wayne G. Church." Obviously, no one believed that the land and structures could own a motor vehicle. Rather, the parties clearly regarded the owner of the truck as a separate legal entity and that legal entity was the partnership known as Woodfield Oaks.

At various times since the principals decided to construct the apartments, they have referred to the business venture being a partnership and have referred to those involved as partners. This occurred in various discussions and conversations involving the principals. In fact, this continued even during the trial of this case, when at least two of the principals, while testifying, referred to the principals as being partners. In addition to such verbal acknowledgements of partnership status, various legal documents have been executed which identified the business venture as a partnership and those involved as partners. For example, the agreement which was signed in 1991 when J. Gary Vannoy acquired the interest of Doyle K. Walsh recited that Walsh was "a general partner in Woodfield Oaks, a North Carolina general partnership" and also recited that the obligation to Mr. Walsh would be guaranteed by "all remaining general partners in Woodfield Oaks general partnership...." Additionally, in February of 1992, less than four months after executing the note and deed of trust to the defendant, J. Gary Vannoy signed and filed in a pending lawsuit a Motion to Claim Exempt Property in which the apartments were shown as "Woodfield Oaks partnership" and Mr. Vannoy was shown as having a ¼ ownership in such partnership. When J. Gary Vannoy filed his Chapter 7 bankruptcy case, Woodfield Oaks Apartments again were shown as a partnership and Mr. Vannoy was shown as having a partnership interest.

In summary, the evidence established that the principals intended and were aware that they were operating as partners in a general partnership known as Woodfield Oaks Apartments. However, even if the principals had not intended to form a partnership, the foregoing declarations and conduct of the principals are sufficient to give rise to an implied agreement to form a partnership. Accordingly, in November of 1991, when the Thomas note and deed of trust were executed, Woodfield Oaks was a general partnership and J. Gary Vannoy was one of the partners in that partnership.

II. *Were the apartments partnership property?*

Based upon the conduct of the partners in this case and the manner in which they conducted the business of the partnership and dealt with the property in question, the court also has concluded that the apartments were property of the partnership known as Woodfield Oaks. The court finds that the partners understood and intended that the apartments were property of the partnership and that under North Carolina law the apartments therefore should be regarded as partnership property.

Under G.S. § 59-38(a) all property which is originally brought into a partnership is partnership property. In the present case, the partners acquired the 15.98 acre tract of land as the first step in carrying out the business venture which they had associated together to own and operate. The only reason the property was deeded to them was so that they could pursue the business venture

which they were pursuing as partners. The property in this case thereby was brought into the partnership and therefore is "partnership property" within the definition contained in subparagraph (a) of G.S. § 59–38.

■ G.S. § 59–38(b) provides that property acquired with partnership funds is partnership property, unless a contrary intention appears. In the present case, partnership funds were used to pay for the apartments. In that regard, the partnership tax returns and other evidence reflect that the partners borrowed the money to acquire the land and build the apartments. Thereafter, the rents from the apartments, i.e., partnership funds, were used to pay the principal and interest on the acquisition loans. Thus, the apartments were acquired with partnership funds and are "partnership property" within the definition contained in subparagraph (b) of G.S. § 59–38, absent a contrary intention on the part of the partners. In this case, there was no contrary intention on the part of the partners. Certainly, the fact that the property was held· in the names of the partners does not establish a contrary intention nor mean that the property is not partnership property. Under North Carolina law, there is no requirement that partnership property be held in the name of the partnership. The language of G.S. § 59–38 recognizes that real property can be partnership property without being held in the name of the partnership. In that regard, this statute provides: "any estate in real property *may* be acquired in the partnership name." (Emphasis supplied). Moreover, G.S. § 59–40, which deals with the manner in which real property of a partnership may be conveyed, implicitly recognizes that partnership real property can be held in the name of one or more of the partners. The statute thus provides: "where title to real property is in the name of one or more, but not all of the partners ..." and "[W]here the title to·real property is in the names of all the partners...." See, G.S. § 59–40(c), (d) and (e). Consistent with these provisions of the Uniform Partnership Act, courts in North Carolina and other jurisdictions consistently have held that partnership property need not be held in the name of the partnership. *Potter v. Homestead Preservation Association,* 330 N.C. 569, 412

S.E.2d 1 (1962) (partnership property may be held be fewer than all of the partners); *Simmons v. Quik–Stop Food Mart, Inc., supra;* (title to real property owned by a partnership may be held either in the partnership name or in the name of some or all of the partners). In accord, *In re Urban Development Company and Associates,* 452 F.Supp. 902 (D.Md.1978) (property recorded in the name of individual partners can be partnership property); *In re Machi Produce, Inc.,* 128 B.R. 134 (Bankr.W.D.Pa.1991) (property not held in the name of the partnership is partnership property because it was acquired with partnership funds).

■ An important factor in determining whether property listed in the names of the partners is partnership property is whether the property is used by those partners for partnership purposes. If so, such use of the property is evidence of an intention that the property be partnership property. Thus, the use of such property for partnership purposes is strong evidence that the property, in fact, is partnership property. *See, In re Urban Development Company and Associates, supra; Kay v. Gitomer,* 253 Md. 32, 251 A.2d 853 (1969); *Potter v. Homestead Preservation Association, supra.* In the present case, from the time the property in question was acquired until the time of the trial in this case, the partners devoted the property solely to the purpose of the partnership, namely, the ownership and operation of the apartments in order to produce a profit for the partners. The intent and understanding of the partners that the apartments were partnership property is confirmed in the partnership and individual tax returns in which the apartments consistently were shown as property of the partnership. This intent and understanding on the part of the partners is further confirmed by the fact that the *ad valorem* taxes for the apartments were in the name of the partnership.

The defendant argues that the later deeds between partners and deeds of trusts to the banks which do not refer to a partnership show that the parties did not intend for the property to be partnership property. This argument is unconvincing, given the fact that

record title was originally placed in the names of the original four partners. Since record title was in the individual names of the partners, it was appropriate for an incoming partner, acquiring the partnership interest of an original partner, to also obtain a deed from the departing partner in order to remove him from the chain of title and divest him of the "bare legal title" he held as a result of the original deed. *See, In re Urban Development Company and Associates, supra* at 906. Following the original deed to the original four partners they could have executed a deed placing the title to the property in the name of the partnership. However, it was not necessary or required that they do so. Since they left the property in their individual names, the subsequent deeds and deeds of trust which were executed when partners were replaced and when bank loans were obtained are inconclusive regarding the status of the property.

In short, the principals came together and formed a partnership in order to acquire land, build apartments and rent out those apartments for a profit. The only asset of the partnership of any significant value was the apartment complex; and without the apartments there would have been no partnership. Viewing the totality of the circumstances surrounding the acquisition of the property, the construction of the apartments and the manner in which the principals thereafter operated and maintained the apartments, the court has concluded that the apartments were partnership property in November of 1991 when the note and deed of trust were executed by Mr. Vannoy.

 The court has carefully considered the testimony of some of the principals that they understood or believed that they had an undivided interest in the property which they could transfer when they wished to do so. While the evidence supports the conclusion that the principals may have *assumed* that they had an interest in the apartments which they could transfer or encumber, the evidence did not establish that there was ever a meeting of the minds or an agreement that the apartments would not be partnership property. The strongest inference to be drawn from the testimony as a whole is that

the principals did not stop to examine exactly what their "interest" consisted of nor the legal requirements associated with transferring or encumbering that interest. They assumed but did not articulate and agree. Assumptions which the principals may have made regarding the status and transferability of the property do not override the legal consequences flowing from the manner in which they conducted business and dealt with the property in question. Whether they knew it or even intended it, these parties formed a partnership. That partnership had a single asset throughout its existence. Where a partnership is formed and operated around a single asset for a period of years, courts should be reluctant to permit the partners to separate that asset from the partnership, particularly after the occurrence of a transaction or event giving rise to a legal controversy and particularly on the basis of after-the-fact testimony regarding their subjective intentions. In the absence of unambiguous evidence that such separation was intended from the outset and meticulously observed thereafter, this court is reluctant to permit the unraveling of the partnership in order to separate the only asset from the partnership and alter the liabilities and other legal consequences of having operated as a single asset partnership over a long period of time. The partners should not be permitted to jump back and forth between partnership status and joint ownership status, depending on what best serves their interests or the interests of their friends at a particular time. In summary, the result of the conduct and declarations of the principals in the present case is that a partnership was formed and the Woodfield Oaks apartment complex was property of that partnership. The legal requirements for transferring the interests of the partners in that partnership are controlled by applicable law and not by assumptions which may have been made by the partners.

III. *What were the legal consequences of the deed of trust executed by J. Gary Vannoy?*

 The first matter to be resolved regarding this issue has to do with the breadth of the determination which should be

made by this court regarding the deed of trust. In that regard, this court must remain cognizant of the fact that the debtor in this case is a partner and not the partnership. Additionally, the court must be mindful that neither the partnership nor the other general partners are parties to this adversary proceeding. Both of these circumstances serve to limit the scope of the decision which should be made by this court regarding the deed of trust. This limitation may best be understood by first looking at the consequences of a general partner filing a bankruptcy case, which include the following: (1) when a debtor owns an interest in a partnership his interest in the partnership is property of the estate; (2) assets owned by the partnership are not property of the estate; and (3) partnership assets are not administered in the bankruptcy case of one of the partners. *See, In re Wallen,* 43 B.R. 408 (Bankr.D.Idaho 1984); *In re Menton Group, Inc.,* 46 B.R. 222 (S.D.N.Y.1985); *In re Berlin,* 151 B.R. 719 (Bankr.W.D.Pa.1993). What this means in the present case is that Mr. Vannoy's interest in the partnership is property of the estate, but the apartments are not property of the bankruptcy estate in the present case. This court should and will determine the effect of the deed of trust upon the debtor's partnership interest. However, the court will not undertake to determine whether the deed of trust created a lien upon all or any portion of the real property owned by the partnership. To do so would be tantamount to administering partnership property. Additionally, and of equal importance, the court would be doing so in a proceeding in which neither the partnership nor the other partners are parties. It would be a serious error and ineffective for this court to attempt to bind the partnership and the other partners with a ruling in a proceeding in which they are not parties. At the same time, a ruling regarding the apartments which would not bind all of those who have an interest in the apartments would accomplish little, if anything. Therefore, the court will not attempt to adjudicate whether the deed of trust transferred an interest in the partnership property.

Turning to Vannoy's partnership interest, the extent of his rights as a partner and the nature of those rights are defined by statute. The "property rights" of a partner are described in G.S. § 59–54 as follows: (1) his right in specific partnership property; (2) his interest in the partnership; and (3) his right to participate in the management.

The court will consider the effect of the deed of trust upon each of these partnership rights in the order which they are listed in the statute. First, did the deed of trust encumber or transfer Vannoy's right in specific partnership property, i.e., in the real property owned by the partnership? The starting point for answering this question is G.S. § 59–55 which describes the nature of a partner's right in specific partnership property. Under this statute a partner is co-owner with his partners of specific partnership property holding such co-ownership as a tenant in partnership. This statute specifically provides that a partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership. The extent to which a partner may transfer or assign his interest in specific partnership property is controlled and limited by subparagraph (2) of G.S. § 59–55, which provides:

"A partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all the partners in the same property."

The effect of this provision is to invalidate or render void an assignment by a partner of his interest in specific partnership property if such assignment is not joined in by the other partners. The applicable rule is stated in 59 Am Jur 2d *Partnership* § 405:

"The Uniform Partnership Act provides that one of the incidents of a tenancy in partnership is that a partner's right in specific partnership property is not assignable except in connection with the assignment of rights of all the partners in the same property. A partner's assignment of specific partnership property contrary to this general rule is void, except as to assignments made prior to the adoption of the Uniform Partnership Act, since the Act does not apply retroactively."

In accord, *Smithfield Oil Co., Inc. v. Fur-longe,* 257 N.C. 388, 126 S.E.2d 167 (1962), which held that an assignment by one partner of his interest in a partnership lease did not transfer any interest to the transferee, since the other partner in the partnership was not a party to .the assignment.

In the present case, the facts are that the other partners were informed that Vannoy was borrowing $107,500.00 from the defendant and that Vannoy intended to give the defendant a deed of trust on *his* interest in the apartments. The evidence also showed that the other partners approved of the transaction, including the execution of the deed of trust by Vannoy. However, the other partners were not asked to assign, convey or encumber *their* interest in the apartments and did not do so. Therefore, it cannot be said that Vannoy assigned or transferred his tenancy in partnership in the apartments "in connection with the assignment of rights of all the partners" in the apartments. The purported assignment therefore did not comply with the requirement of G.S. § 59–55(2) and his tenancy in partnership in the apartments was not assigned nor encumbered by the deed of trust from the debtors.

In order to determine whether the deed of trust encumbered Mr. Vannoy's "interest in the partnership", the second of his partnership rights under G.S. § 59–54, reference must be had to G.S. § 59–56 which provides:

"A partner's interest in the partnership is his share of the profits and surplus, *and the same is personal property.*" (Emphasis supplied).

Did the deed of trust create a lien upon or encumber this "personal property" of Vannoy? The language of the deed of trust itself probably requires a negative answer to this question, since the deed of trust, by its terms, does not purport to transfer any interest other than an interest in real property. However, even if the deed of trust could be read as intended to create a security interest in Vannoy's partnership interest, it did not do so. The fact that the partnership interest is personal property brings into play G.S. § 25–9–102 which makes Article ·9 of the Uniform Commercial Code applicable to "any

transaction (regardless of its form) which is intended· to create a security interest in *personal property* or fixtures including ... general intangibles ... created by contract including ... trust deed...." Since a partner's interest in a partnership is personal property (i.e., a general intangible), a transaction intended to create a security interest in a partnership interest therefore must comply with the requirements of Article 9, including the requirement for filing financing statements. *See, e.g., In re Charter First Mortgage, Inc.,* 7 UCC Rep.Serv.2d 1644, 1988 WL 391500 (Bankr.D.Or.1988); *Rankin Properties, Ltd. v. Woodhollow Estates,* 714 F.Supp. 800 (S.D.Miss.1989); *In re Ellingsen Maclean Oil Co., Inc.,* 98 B.R. 284 (Bankr. W.D.Mich.1989); *Madison National Bank v. Newrath,* 261 Md. 321, 275 A.2d 495 (Ct.App. 1971). The applicable filing requirement in North Carolina is found in G.S. § 25–9–401(1)(c), which mandates that financing statements be filed in both the office of the Secretary of State and in the office of the Register of Deeds in the county of the debtor's place of business. In this case no financing statements were filed in either place, with the result that no security interest in Vannoy's partnership interest was perfected prior to the commencement of his Chapter 7 case. Hence, even if the deed of trust had been intended to create a security interest in Vannoy's partnership interest, it would be avoidable by the trustee and ineffective under § 544 of the Bankruptcy Code.

The last of Mr. Vannoy's rights under G.S. § 59–54 is his right to participate in the management of the partnership. Under partnership law, this right is not transferable by a partner to an outsider. In that regard, G.S. § 59–57 specifically provides that a conveyance by a partner of his interest in the partnership does not "entitle the assignee, during the continuance of the partnership, to interfere in the management or administration of the partnership business or affairs...." However, even if such interest were transferable, it would be personal property within the meaning of G.S. § 25–9–102 and, as a result, no security interest could be perfected without complying with the requirements of the Uniform Commercial Code

**772**

as discussed in the preceding paragraph. Therefore, even if the deed of trust had been intended to create a security interest in Vannoy's right to participate in the management of the partnership, the deed of trust was ineffective in doing so.

## CONCLUSION

The deed of trust executed by Mr. and Mrs. Vannoy on November 18, 1991, did not create a security interest in the partnership interest of Mr. Vannoy in the partnership known as Woodfield Oaks. The Trustee, therefore, is entitled to avoid such deed of trust to the extent that the deed of trust is alleged to create a security interest in the partnership interest of Mr. Vannoy. The court does not address nor decide whether the deed of trust is valid with respect to the real property and apartment complex owned by the partnership.